Michael Delikat
James H. McQuade
Mayotta H. Anderson
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY  10103
Telephone:  (212) 506-5000

Attorneys for Defendants Wyeth Pharmaceuticals, Inc.
and Charles Guinosso

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MELLARD JENNINGS,

                              Plaintiff,

     -against-

WYETH PHARMACEUTICALS, INC. and
CHARLES GUINOSSO,

                              Defendants.

07 Civ. 953 (CLB)(MDF)

**DEFENDANTS' RULE 56.1
STATEMENT**

Defendants Wyeth Pharmaceuticals, Inc. ("Wyeth") and Charles Guinosso, by their

attorneys, Orrick, Herrington & Sutcliffe LLP, as and for their statement of material facts as to

which there is no genuine issue to be tried, state as follows:

**Background**

1.     Wyeth is a company engaged in the development and manufacture of

pharmaceutical, consumer healthcare, and animal health products.   Wyeth operates a

pharmaceutical manufacturing facility in Pearl River, New York.  Declaration of Edward Herpel

("Herpel Decl."), ¶ 2.

2.     Plaintiff Mellard Jennings began his employment with Wyeth in 1982 as a

technician in the Chemical Development Group, which is part of Wyeth's Research and

Development Department.  Declaration of James H. McQuade ("McQuade Decl."), Ex. 1, at 23-24; Ex. 3, at 7-8, 12.

3.      Jennings was promoted to the position of Research Scientist, Chemistry, where he was responsible for, among other things, working on chemical research performed in a laboratory.  McQuade Decl., Ex. 1, at 30, 51 & Ex. 1, ¶ 15.  In or about 1989, Jennings began reporting to Dr. David Blum.  McQuade Decl., Ex. 1, at 25, 30.

4.      Beginning in late 2001, Blum reported to Michael O'Brien, who was a Senior Director of Chemical Development.  McQuade Decl., Ex. 1, at 52, 289; Ex. 4, at 6-7.

5.      Jennings had a close personal relationship with Blum, socialized with Blum and his family outside of work, and talked freely with Blum about personal and work matters. Jennings described Blum as a "friend . . ., mentor, counselor, just a respected person whom I loved, . . . [and] one of the best managers" at Wyeth.  McQuade Decl., Ex. 1, at 32-34.

6.      After Blum passed away in January 2007, Jennings reported to Roger Farr from February 2007 through May 22, 2007.  Declaration of Karen Sutherland ("Sutherland Decl."), ¶ 2.

7.      Jennings reported to Karen Sutherland, a Director of Chemical Development, from May 23, 2007 through the present.  Sutherland Decl., at ¶¶ 1-2.  Sutherland reports to O'Brien.  McQuade Decl., Ex. 4, at 8.

8.      In 2002, Defendant Charles Guinosso was working at Wyeth's Pearl River facility as a Scientist and was responsible for various laboratory work.  McQuade Decl., Ex. 2, at 9-11.

9.      Guinosso has never supervised any employees at Wyeth.  McQuade Decl., Ex. 2, at 11.

10.     Guinosso was never Jennings' supervisor.  McQuade Decl., Ex. 1, at 92-93.

**Guinosso's Alleged Use Of The Word "Boy" In Jennings' Presence**
**On Three Occasions From May 2002 Through August 2002**

11.    Jennings' claims in this case relate solely to events that occurred after May 2002. McQuade Decl., Ex. 1, at 54.

12.    In 2002, Jennings began working on the second floor of Building 240, where he had an office and performed work in a laboratory.  McQuade Decl., Ex. 1, at 32, 57.

13.    Building 240 has two floors of office space and a number of laboratories, including a special projects laboratory located on the second floor.  McQuade Decl., Ex. 1, at 56-57; McQuade Decl., Ex. 2, at 10.

14.    In May 2002, both Guinosso and Jennings had offices on the second floor of Building 240.  McQuade Decl., Ex. 1, at 57, 61-62.

15.    Jennings' office was adjacent to the main hallway on the floor and had a window that faced out onto that hallway.  McQuade Decl., Ex. 1, at 57-58.

16.    In May 2002, Guinosso worked in the special projects laboratory working on various chemical reactions in that laboratory.  McQuade Decl., Ex. 2, at 9-11.

17.    In 2002, Jennings did not work directly with Guinosso and would see him a few times a week, mostly in the hallways of Building 240.  McQuade Decl., Ex. 2, at 18-19.

18.    Jennings claims that, between May 2002 and August 2002, Guinosso said the word "boy" on three to five occasions as Guinosso walked by him at work.  McQuade Decl., Ex. 1, at 16-18.   However, at his deposition, Jennings could recall only three such instances specifically.  McQuade Decl., Ex. 1, at 62-70.

19.    Jennings claims that, on each of these three instances, Guinosso walked by him, either in the hallway or as he was leaving the special projects lab, and said the word "boy" as he

passed by him, and that neither Guinosso nor Jennings said anything else to each other on these occasions. McQuade Decl., Ex. 1, at 17-18, 62-70.

20.     Jennings claims that the first time Guinosso said the word "boy," he did not tell anyone about it and that he decided to "turn[] a cheek," and "let it go." McQuade Decl., Ex. 1, at 16-17, 62-63.

21.     Jennings claims that after the second or third such incident, he told Blum that Guinosso had said the word "boy" and explained that he did "not really like" it. McQuade Decl., Ex. 1, at 18-20, 65-67.

22.     In response, Blum asked Jennings if he wanted to make a formal complaint with Wyeth's Human Resources Department, and Jennings told Blum that he did not want to make a formal complaint with the Human Resources Department, but instead preferred to "leave it alone for now." McQuade Decl., Ex. 1, at 18-19, 70-71.

23.     At the time Guinosso allegedly said the word "boy" in Jennings' presence, Jennings understood that, under Wyeth's discrimination and harassment policies, he had the right to make a complaint of discrimination or harassment with Wyeth's Human Resources Department. McQuade Decl., Ex. 1, at 70.

24.     Jennings chose not to make a complaint of discrimination or harassment with Wyeth's Human Resources Department based on Guinosso's alleged use of the word "boy" during the time period May through August 2002. McQuade Decl., Ex. 1, at 18-19, 70-71.

25.     Jennings had no further problems with Guinosso from August 2002 through June 16, 2003. McQuade Decl., Ex. 1, at 73.

26.    Jennings admits that he was not exposed to any discrimination or harassment by Guinosso or anyone else at Wyeth from August 2002 through June 16, 2003.  McQuade Decl., Ex. 1, at 73-74.

27.    Nearly an entire year passed between the time Guinosso allegedly said the word "boy" in Jennings' presence and the next alleged act of harassment Jennings claims to have experienced at work.  McQuade Decl., Ex. 1, at 73-74.

**June 16, 2003 Incident Between Jennings And Guinosso**

28.    In or around Spring of 2003, Guinosso and Jennings were working on the same project together.  McQuade Decl., Ex. 1, at 74-75, 92.

29.    On June 16, 2003, Jennings entered the special projects lab to ask Guinosso whether he had performed a certain chemical reaction related to the project.  McQuade Decl., Ex. 1, at 75.  According to Guinosso, when Jennings entered the laboratory, Jennings referred to him as "Mr. Charlie," which both Jennings and Guinosso understood to be a derogatory term for a white man.  McQuade Decl., Ex. 1, at 94-95; McQuade Decl., Ex. 2, at 21-22.

30.    The Merriam Webster's Collegiate Dictionary, Tenth Edition, provides the following definition for "Mr. Charlie": "a white man: white people – usu[ally] used disparagingly."  McQuade Decl., Ex. 5.

31.    The American Heritage Dictionary defines "Mr. Charlie" as: "*Offensive slang.  A white individual or white people collectively.*"  McQuade Decl., Ex. 6.

32.    Guinosso was offended by the "Mr. Charlie" statement.  McQuade Decl., Ex. 2, at 23.

33.    Guinosso had told Jennings on a number of occasions not to use the "Mr. Charlie" term with him.  McQuade Decl., Ex. 2, at 21-23.

34.    According to Guinosso, he responded to the "Mr. Charlie" comment by calling Jennings "Aunt Jemima." McQuade Decl., Ex. 2, at 21, 23.

35.    Jennings claims that Guinosso then went into an "Amos and Andy" routine, depicting a black man's voice. McQuade Decl., Ex. 1, at 76-79, 97. The only specific words that Jennings recalls Guinosso saying during this incident were "Aunt Jemima" and "you people of color." McQuade Decl., Ex. 1, at 74-79, 97-99.

36.    Guinosso denies that he acted out an "Amos and Andy" routine and that he said "you people of color." McQuade Decl., Ex. 2, at 25-26. This whole exchange in the special projects lab lasted a couple of minutes. McQuade Decl., Ex. 2, at 23-24.

37.    According to Frederick Vyverberg, another Wyeth employee who was present in the special projects lab when this incident occurred, Jennings and Guinosso were both arguing and giving each other a hard time and exchanging derogatory remarks. Declaration of Julie LeSueur ("LeSueur Decl."), at ¶ 8 & Ex. 3.

38.    Immediately after this incident, Jennings went to James Farina's office to ask him a question about the chemical reaction he had asked Guinosso about. McQuade Decl., Ex. 1, at 80-82. Jennings claims that the following events then occurred in Farina's office:

> I left the lab and proceeded to speak with Dr. James Farina. The conversation revolved [around] the thermal cyclization, Dr. Farina addressed the issue that Mr. Guinosso synthesize only a 5-liter scale and not a 12-liter. Mr. Guinosso upon seeing me speak with his boss (Dr. James Farina) entered his office. Dr. Farina asked Mr. Guinosso to give me details related to the thermal cyclyzation. Mr. Guinosso replied "he is afraid of chemistry I'm not telling him anything." Mr. Guinosso enclosed the gap between us raising his voice, Dr. Farina came from behind his desk and stood between us. Mr. Guinosso yelled that I was a "hypocrite" I replied "Charlie you talk big in front of Dr. Farina but you wouldn't speak like that outside the gate." I departed to go to the restroom. I stepped into the hallway and Mr. Guinosso continued screaming and yelling at me. I made up my mind to go seek help from my boss Dr. David Blum in building 222.

McQuade Decl., Ex. 1, at 80-85, 100-08 & Ex. 3.

39.    According to Farina, while in his office, both Jennings and Guinosso "adopted confrontational postures, tones of voices, statements, and language." LeSueur Decl., at ¶ 9 & Ex. 4.

40.    Guinosso made no statements of a racial nature to Jennings in Farina's office. McQuade Decl., Ex. 1, at 87, 103-08.

41.    Jennings did not feel physically threatened by Guinosso either during their argument in Farina's office or at any other time at Wyeth. McQuade Decl., Ex. 1, at 88-90.

42.    Jennings testified as follows:

Q:    Were you fearful of Mr. Guinosso when you were in the office with Mr. Farina?

A:    No Sir.

Q:    Why is that?

A:    I was in the military. I wasn't fearful, just wasn't fearful of him.

Q:    You could handle him yourself?

A:    I think so, counsel.

Q:    [C]an you tell me how tall you are . . . Mr. Jennings?

A:    ... I'm 6'2, sir.

Q:    And what is your –

A:    About 260 pounds.

Q:    Does it have something to do with the fact that you weren't afraid of him physically that you were a much bigger man than he is?

A:    I just don't carry any fear of any man, counsel.

McQuade Decl., Ex. 1, at 88-89.

43.    Jennings has been in physical altercations in his life, specifically while completing basic training and serving in the military. McQuade Decl., Ex. 1, at 85.

44.     Jennings left Farina's office and went to Dr. Michael O'Brien's office to report the incident with Guinosso.  McQuade Decl., Ex. 1, at 87-88, 109-110.  O'Brien instructed Jennings to "go to human resources."  McQuade Decl., Ex. 1, at 87-88, 109-110.

45.     Jennings then went to the Human Resources Department and reported this incident to Julie LeSueur, a Human Resources representative.  McQuade Decl., Ex. 1, at 110-111.

46.     LeSueur interviewed Jennings about the incident for approximately 30 to 45 minutes.  McQuade Decl., Ex. 1, at 111.

47.     LeSueur launched an investigation of the incident, which included interviewing and reviewing written statements from Jennings, Guinosso, Vyverberg, and Farina.  LeSueur Decl., at ¶¶ 4-10 & Exs. 1-4.

48.     Approximately two weeks later, LeSueur met with Jennings and Blum, during which they discussed the incident again, and LeSueur told Jennings she was conducting an investigation.  McQuade Decl., Ex. 1, at 112-15.

49.     In late June 2003, based on the poor behavior that Vyverberg and Farina observed from both Jennings and Guinosso on June 16, 2003, it was decided that Jennings and Guinosso would be required to separately attend a Civil Treatment training course offered by Wyeth.  LeSueur Decl., at ¶ 11; McQuade Decl., Ex. 2, at 46-47; McQuade Decl., Ex. 4, at 33.

50.     Shortly thereafter, it was determined that Guinosso also would be disciplined with a written warning letter for his conduct on June 16.  LeSueur Decl., at ¶ 12.

51.     On July 28, 2003, Jennings went out on a medical leave of absence and did not return to work until late October 2003.  McQuade Decl., Ex. 1, at 120.  Jennings had a number of medical conditions, including pneumonia and pericarditis.  McQuade Decl., Ex. 1, at 120-22.

52.     As a result of the June 16 incident with Jennings, Guinosso received a formal written warning letter from James Farina. McQuade Decl., Ex. 2, at 48-49 & Ex. 3. The letter stated that the "HR investigation revealed that several witnesses observed some behaviors and actions where you and Mr. Jennings reacted or provoked each other in inappropriate ways [and that] [a]ny further incidence(s) will result in appropriate action being taken to correct the situation according to Company policy." McQuade Decl., Ex. 2, at Ex. 3. The letter further stated that "[t]his action may include, but is not limited to, oral or written warning (now given), referral to formal counseling or training, disciplinary suspension or probation, or discharge from Wyeth." McQuade Decl., Ex. 2, at Ex. 3.

53.     Shortly after receiving his written warning, Guinosso sent LeSueur an email providing additional information regarding the June 16 incident and referred to an incident in 2000 when Jennings intentionally bumped into Guinosso on an elevator. McQuade Decl., Ex. 2, at 59-66 & Ex. 4.

54.     After the June 16, 2003 incident, Jennings had no other problems with Guinosso for the remainder of the year. McQuade Decl., Ex. 1, at 124.

**Jennings Complains To The Human Resources Department About Guinosso In February 2004, Immediately After Learning That Guinosso Had Complained About Him**

55.     By email dated February 3, 2004, Guinosso asked LeSueur if any action had been taken against Jennings in connection with the 2000 elevator bumping incident. LeSueur Decl., at ¶ 15 & Ex 6.

56.     On February 4, 2004, LeSueur responded to Guinosso's email, with a blind copy to Jennings, advising Guinosso that she would look into the elevator bumping incident and get back to him. LeSueur Decl., at ¶ 15 & Ex 6.

57.     LeSueur investigated the alleged elevator bumping incident, and reported back to Guinosso that, because much time had passed since the incident and the employees Guinosso named as witnesses did not recall the event, there would be no further investigation.  LeSueur Decl., at ¶ 15 & Ex 7.

58.     When Jennings learned that Guinosso had made a complaint against him relating to the elevator bumping incident, Jennings hired his current attorneys and decided to bring this lawsuit.  McQuade Decl., Ex. 1, at 182-84.

59.     On February 9, 2004, just a few days after learning that Guinosso had made a complaint against him relating to the elevator bumping incident, Jennings contacted LeSueur and complained for the first time that Guinosso had stared at him when they were in the hallways of Building 240 and that Guinosso had sexually harassed various female employees.  LeSueur Decl., at ¶¶ 16-17.

60.     Despite LeSueur's repeated requests, Jennings never disclosed the names of the women he claimed were sexually harassed by Guinosso, and therefore, LeSueur was unable to investigate his allegation.  LeSueur Decl., at ¶¶ 18-19.

61.     Although Jennings claimed to LeSueur on February 9, 2004 that Guinosso had made faces at him, at his deposition Jennings recalled no problems with Guinosso until April 28, 2004.  McQuade Decl., Ex. 1, at 152-53.

62.     In or about February 2004, O'Brien decided to move Guinosso to work in a different building, Building 222, to minimize interaction between Guinosso and Jennings and because Guinosso's work as part of a reorganization required him to be in Building 222.  McQuade Decl., Ex. 2, at 70; McQuade Decl., Ex. 4, at 48; LeSueur Decl., ¶ 23 & Ex. 8.

63.     After his move to Building 222, Guinosso had to go to Building 240 at times to work on certain projects in the labs of Building 240.  McQuade Decl., Ex. 2, at 72-75.

64.     On April 14, 2004, Jennings called LeSueur to ask why Guinosso was still spending time in Building 240 after Jennings was transferred to Building 222 and to report that Guinosso had given him dirty looks in the hallway.  LeSueur Decl., at ¶ 21.

65.     On that same day, LeSueur advised Jennings that if Guinosso's current projects required him to be in Building 240 to do hydrogenization work, for the good of the overall department, he would have to accept this.  McQuade Decl., Ex. 1, at 225-27 & Ex. 10; LeSueur Decl., at ¶ 23.

66.     LeSueur advised Jennings that, if "Charles' behavior goes beyond his reported dirty looks to you, contact me and we will discuss further."  McQuade Decl., Ex. 1, at 227 & Ex. 10.

67.     On April 28, 2004, Jennings claims he observed Guinosso in a laboratory in Building 240, and Jennings claims this made him feel "uneasy and uncomfortable, and [he] just didn't like that."  McQuade Decl., Ex. 1, at 155-56.  Jennings claims that he simply walked out of the room, and there was no interaction between them.  McQuade Decl., Ex. 1, at 157.

68.     Later on April 28, 2004, Jennings claims that he noticed Guinosso in his office speaking to another employee, Lisa Routel.  McQuade Decl., Ex. 1, at 157-58.  According to Jennings, Guinosso looked at him and grinned.  McQuade Decl., Ex. 1, at 158-59.

69.     From the time period April 28, 2004 through October 9, 2006, Jennings saw Guinosso a total of three to five times.  McQuade Decl., Ex. 1, at 164-65.  On each of these occasions, Jennings and Guinosso passed each other walking in the hallway.  McQuade Decl., Ex. 1, at 165.  Jennings claims that Guinosso would grin at him and make some type of jeering

sound under his breath.  McQuade Decl., Ex. 1, at 165.  Jennings failed to allege both in his Complaint and in the notes that he allegedly maintained while working at Wyeth that these events occurred.  McQuade Decl., Ex. 1, at Exs. 1 and 6.

**Guinosso's Alleged Dirty Looks From October 2006 Through The Present**

70.    In October 2006, Dr. Mahdi Fawzi decided to move Guinosso into a new position because Guinosso was experiencing job performance issues, and it was believed that this position would be a better match to his abilities.  McQuade Decl., Ex. 1, at 161, & Ex. 1, ¶ 41; McQuade Decl., Ex. 4, at 73-76.  In this new position, Guinosso began working in the Kilo laboratory run by Kevin McCoy in Building 240.  McQuade Decl., Ex. 4, at 74.

71.    As a result of his new position with the group run by McCoy, Guinosso moved from Building 222 to Building 240.  McQuade Decl., Ex. 4, at 73-74.  Guinosso moved to the first floor of Building 240, and Jennings works on the second floor of Building 240.  McQuade Decl., Ex. 1, at 198.

72.    The Kilo Lab where Guinosso began working was on a separate floor and in a separate wing from where Jennings worked in Building 240.  McQuade Decl., Ex. 4, at 74-75.  Guinosso's work area is in a gated and limited access area.  McQuade Decl., Ex. 4, at 74-75; McQuade Decl. Ex. 2, at 77-78.

73.    Jennings claims that, on October 11, 2006, he spotted Guinosso looking into his office window and "sneering" at him as he walked down the hallway.  McQuade Decl., Ex. 1, at 165-66.  Jennings only saw Guinosso for two to three seconds.  McQuade Decl., Ex. 1, at 166.

74.    On October 13, 2006, Jennings went to the office of Adrienne Messina, a Human Resources Department employee, told her that he had some type of altercation with Guinosso in the past, and complained that Guinosso had glared at him.  McQuade Decl., Ex. 1, at 168, 195-

96; McQuade Decl., Ex. 3, at 13-15; Declaration of Adrienne Messina ("Messina Decl."), at ¶¶ 2-3.

75.     Jennings told Messina that he was concerned that he would not be able to hold himself back if Guinosso said something offensive to him.  McQuade Decl., Ex. 3, at 14. Jennings refused to provide Messina with any specifics regarding his argument with Guinosso in the past, but instead told her to go look at the file and that he was not going to do her job for her. McQuade Decl., Ex. 3, at 16.

76.     After her meeting with Jennings, Messina spoke with Jennings' manager, David Blum, about Jennings' concerns and how to handle his allegations.  McQuade Decl., Ex. 3, at 16-17; Messina Decl., at ¶ 4.

77.     Messina also spoke to Kevin McCoy, Guinosso's supervisor, about the logistics of Building 240 and how frequently Jennings and Guinosso would see each other in the building. McQuade Decl., Ex. 3, at 21-23.  McCoy told Messina that, while Jennings and Guinosso might have some incidental contact with each other in the common areas of Building 240, they would not be working together on any projects, and that Guinosso's current responsibilities made it necessary for him to work in the building.  Messina Decl., at ¶ 5.  Messina asked McCoy to keep an eye on the situation.  McQuade Decl., Ex. 3, at 24-25.

78.     Messina followed up with Jennings by sending him emails and leaving him voicemail messages seeking to schedule another appointment with Jennings.  McQuade Decl., Ex. 3, at 20-21, 23-24.  Jennings failed to respond.  McQuade Decl., Ex. 3, at 20-21, 24; Messina Decl., at ¶ 6.  Messina was not able to pursue his complaint further because Jennings refused to respond to her communications.  McQuade Decl., Ex. 3, at 25; Messina Decl., at ¶ 6.

79.     Jennings never made another complaint to Messina or the Human Resources Department regarding Guinosso.  Messina Decl., at ¶ 7.

80.     From October 2006 through November 6, 2007, Jennings and Guinosso have seen each other in the bathroom on three occasions.  McQuade Decl., Ex. 1, at 194-95, 313-17.  On two of these occasions, Guinosso was in the bathroom first, and, on one occasion, Jennings was in the bathroom first.  McQuade Decl., Ex. 1, at 194-95, 313-17.  Jennings admits that were no exchanges of words or glances on these occasions, except on one occasion, when they looked at each other for 5 to 10 seconds.  McQuade Decl., Ex. 1, at 194-95, 313-17.

81.     On November 8, 2006, Jennings spotted Guinosso walking by his office looking in his window.  Jennings does not contend that Guinosso was sneering at him on this occasion.  McQuade Decl., Ex. 1, at 193-94.

82.     According to Jennings, he has seen Guinosso on five to seven additional occasions during the time period November 7, 2007 through December 21, 2007, in the hallway, breakroom, or bathroom.  McQuade Decl., Ex. 1, at 318-19, 326-28.

83.     According to Guinosso, since the incident with Jennings in June 2003, he has never peered into Jennings' office.  McQuade Decl., Ex. 2, at 48-50.

84.     According to Guinosso, he has tried to avoid Jennings, has never said anything to him in the hallway, has avoided eye contact with him, and has never made any faces at him.  McQuade Decl., Ex. 2 at 48-50, 56-57, 75-77.

**Selection Of Dr. Weiguo Liu For Assignment**

85.     In 2004, O'Brien was formulating a plan to transform the Special Projects laboratory in Building 240 from a small-scale flat-bottom lab to a large-scale cylindrical reactor

equipped laboratory, which mimicked manufacturing reactors. McQuade Decl., Ex. 1, at 241-44; McQuade Decl., Ex. 4, at 56-61.

86.    O'Brien needed to have someone oversee the implementation of this plan, including the ordering and installation of new equipment for the laboratory. McQuade Decl., Ex. 4, at 61-62.

87.    O'Brien selected Dr. Weiguo Liu to oversee the implementation of the plan to install large-scale cylindrical reactor equipment in the lab. McQuade Decl., Ex. 1, at 131; McQuade Decl., Ex. 4, at 63.

88.    O'Brien selected Dr. Liu because he had been the most proactive user of cylindrical glassware, which was the technology O'Brien was trying to get the scientists in his group to adopt, and because he had the best understanding of the cylindrical reactor system. McQuade Decl., Ex. 4, at 63.

89.    O'Brien had a program in place for scientists to adopt the use of cylindrical reactors. McQuade Decl., Ex. 4, at 63-64. O'Brien felt that Dr. Liu was a much better choice than Jennings for this assignment because O'Brien believed Jennings was reluctant to embrace this technology. McQuade Decl., Ex. 1, at 244; McQuade Decl., Ex. 4, at 64.

90.    In fact, managers had to instruct Jennings to stop using the round bottom glass ware and convert to the cylindrical reactor. McQuade Decl., Ex. 4, at 64.

91.    At this time, Jennings had been working with round-bottom glassware for more than 20 years and was more comfortable with that type of glassware. McQuade Decl., Ex. 1, at 248-49. Jennings felt that this change should not have been forced upon him, but recognized that he had "to go along with the change" and "surrender to the edict." McQuade Decl., Ex. 1, at 246-47.

92.     O'Brien felt that Jennings had not "bought in" to this fundamental change to cylindrical reactors, and therefore, it made no sense to have him be responsible for installing this new equipment in the laboratory.  McQuade Decl., Ex. 4, at 64.

93.     This was not any type of new job position, but instead it was merely an opportunity to take on an additional responsibility.  McQuade Decl., Ex. 1, at 250-251; McQuade Decl., Ex. 4, at 54-55.  It involved no change in pay, position, or reporting relationship. McQuade Decl., Ex. 4, at 59.

94.     Jennings admits that Liu was very qualified for this position and that he had Ph.D. degree, unlike Jennings.  McQuade Decl., Ex. 1, at 132.

95.     Jennings admitted at his deposition that he did not believe that he was denied this position because of his race.  McQuade Decl., Ex. 1, at 133-38.  Jennings testified as follows:

Q:      So you have no reason to believe that he denied you that position because of your race?

A:      No, sir.

McQuade Decl., Ex. 1, at 138.

96.     Jennings claims that O'Brien did not select him for this opportunity as a form of retaliation because, in June 2003, Jennings had complained about the June 16, 2003 incident with Guinosso.  McQuade Decl., Ex. 1, at 138-39.

**Jennings' Request Regarding The University Of Maryland, Baltimore County**

97.     One of the universities that Wyeth's Research and Development Department actively recruits from is the University of Maryland, Baltimore County ("UMBC").  Declaration of Jeanine M. Boyle ("Boyle Decl."), at ¶ 3.  Each year, Wyeth selects a recruitment team made up of Wyeth employees, who travels to UMBC to recruit students by making various presentations and by interviewing students for positions at Wyeth.  Boyle Decl., at ¶ 3.

98.     The Wyeth employees selected for the recruitment team typically held the title of Senior Director and had experience hiring employees and have training in the area of employment interviewing. Boyle Decl., at ¶ 3. The recruitment team was carefully selected weeks in advance of the recruitment trip and met a number of times to prepare for the trip. Boyle Decl., at ¶ 3.

99.     On January 31, 2007, Jennings contacted Daphne Mobley, then the Vice President of Corporate Diversity for Wyeth, in Madison, New Jersey, and inquired about a speaking opportunity at UMBC, which Jennings had heard about. McQuade Decl., Ex. 1, at 274-75 & Ex. 16.

100.    Other than small meetings among his colleagues, Jennings has only given two presentations during his tenure at Wyeth. McQuade Decl., Ex. 1, at 283-86.

101.    Mobley referred Jennings to Susan Lee of Wyeth's Diversity team, who referred Jennings to Jeanine Boyle, who at that time was responsible for organizing and selecting the recruitment team for UMBC. McQuade Decl., Ex. 1, at 274-77 & Ex. 16; Boyle Decl., at ¶¶ 4-5 & Ex. 1.

102.    On February 2, 2007, Boyle spoke with Jennings and explained to him that the recruitment team was scheduled to travel to UMBC on February 7, 2007, that the recruitment team had been filled up long ago, and that therefore it was too late for him to try to speak at UMBC that year. McQuade Decl., Ex. 1, at 145, 230-231, 274-77; Boyle Decl., at ¶ 6.

103.    Boyle explained to Jennings that there were other potential recruiting opportunities that he could get involved with, but Jennings never followed up with Boyle. Boyle Decl., at ¶ 6.

104. During the time of this exchange between Boyle and Jennings, Boyle did not know that Jennings had made any complaint of discrimination, harassment, or retaliation in connection with his employment at Wyeth. Boyle Decl., at ¶ 7.

105. At his deposition, Jennings testified that he believed that he was not granted the opportunity to join the UMBC recruitment team as a form of retaliation and his only basis for believing this was that he was denied this opportunity:

Q:    So your basis for believing that you were denied these opportunities as a form of retaliation was because you didn't get these opportunities:

A:    Absolutely.

Q:    Any other reason.

A.    No Sir. ...

McQuade Decl., Ex. 1, at 145-46.

**Jennings' Request Regarding Savannah State College**

106. Wyeth has an external publication and presentation policy that applies to all employees. Declaration of William T. King ("King Decl."), at ¶ 2.

107. The policy is designed to protect Wyeth's confidential and proprietary information, including information about pharmaceutical products that are in development and information about research processes and technologies. King Decl., at ¶ 2.

108. According to Wyeth's policy which applies to all employees in the Research and Development Department, before an employee may make an external scientific presentation or publish scientific material, the employee must provide a copy of the proposed presentation to, and obtain approval from, two levels of line management. King Decl., at ¶ 3.

109. After two levels of line management above the employee review and approve the proposed presentation, the employee is required to submit the proposed presentation to Wyeth's

Patent Law Department for its review and approval.  King Decl., at ¶ 4.  The Patent Law Department reviews the proposed presentations to determine whether they would compromise any of Wyeth's confidential and proprietary information and whether the author can take steps to protect the information contained in the presentation by filing patent applications or taking other actions.  King Decl., at ¶ 4.

110.    The Patent Law Department will not approve presentations that disclose detailed chemical reaction schemes for compounds that are in development and that have not been previously disclosed outside of Wyeth.  King Decl., at ¶ 4.

111.    After the Patent Law Department approves a presentation, the employee must send to the Research Information Group in Pearl River a copy of his presentation and an approval form signed by the two managers and an attorney from the Patent Law Department. King Decl., at ¶ 5; McQuade Decl., Ex. 1, at Ex. 13.

112.    Jennings was familiar with this policy, as the policy was available to all employees at Wyeth.  McQuade Decl., Ex. 1, at Ex. 13; Sutherland Decl., at ¶ 5.

113.    Jennings prepared PowerPoint slides for a scientific presentation he wished to give at Savannah State College.  McQuade Decl., Ex. 1, at 267-71.  To obtain approval for this external speaking opportunity, Jennings first submitted the PowerPoint slides to Joy Goudie, an attorney in Wyeth's Patent Law Department.  McQuade Decl., Ex. 1, at 267-71.

114.    Jennings then submitted the PowerPoint slides to Blum, who made numerous suggestions and revisions to the slides.  McQuade Decl., Ex. 1, at 271-72.  However, Jennings did not follow up with the revisions to the slides for a significant period of time because Blum became ill.  McQuade Decl., Ex. 1, at 271-72.

115.    Some time later, Jennings started working on the PowerPoint slides again, revised them, and, on March 12, 2007, sent them to William T. King, an attorney in Wyeth's Patent Law Department for review and approval.  McQuade Decl., Ex. 1, at 267-68, 272-73; King Decl., at ¶¶ 7-8 & Exs. 1-2.

116.    Although Jennings had not sought and obtained approval through his line managers, as would be the proper procedure under Wyeth's policy, King reviewed the PowerPoint slides anyway.  King Decl., at ¶ 9.

117.    The PowerPoint slides Jennings submitted contained confidential detailed chemical reaction schemes for compounds that were in development and that had not been disclosed outside of Wyeth.  King Decl., at ¶ 9.  Such information is considered Wyeth's confidential and proprietary information and constitute trade secrets, which cannot be disclosed outside of Wyeth.  King Decl., at ¶ 9.  Therefore, King determined that Jennings' proposed presentation was not suitable for external publication.  King Decl., at ¶ 9.

118.    King advised Jennings during a telephone conversation that his PowerPoint slides would not be acceptable for publication outside of Wyeth because they contained confidential and proprietary information.  King Decl., at ¶ 10.

119.    At the time King reviewed Jennings' PowerPoint slides and communicated with him regarding those slides in 2007, he had no knowledge of Jennings making any type of complaint of discrimination, harassment, or retaliation in connection with his employment at Wyeth.  King Decl., at ¶ 11.  King first learned of Jennings' claims of discrimination, harassment, and retaliation when he was contacted by Wyeth's counsel in early 2008.  King Decl., at ¶ 11.

120.   Jennings admits he never received approval from the Legal Department for his proposed speaking engagement at Savannah State College.  McQuade Decl., Ex. 1, at 279.

121.   Sutherland advised Jennings that, in order to give a scientific presentation at Savannah State College, Jennings would have to consult with and get approval from her and O'Brien.  McQuade Decl., Ex. 1, at 265, 273; Sutherland Decl., ¶ 7.

122.   Jennings chose not to ask O'Brien for permission.  McQuade Decl., Ex. 1, at 265, 273.

123.   By failing to seek and obtain approval from his managers for a speaking opportunity at Savannah State College, Jennings failed to comply with Wyeth policy.  McQuade Decl., Ex. 1, at 279-80 & Ex. 13.

124.   Jennings claims that it was O'Brien who denied him the opportunity to speak at Savannah State College because he had complained about Guinosso in 2003.  McQuade Decl., Ex. 1, at 178.  Jennings explained that his only basis for believing this was that he was denied the opportunity.  McQuade Decl., Ex. 1, at 179-80.

**Jennings' Request To Attend A Conference In August 2007**

125.   In 2005, O'Brien approved Jennings' request to attend a conference in Florida relating to the topic of "process development."  McQuade Decl., Ex. 1, at 251-54.  Wyeth paid for Jennings' travel expenses and registration fees.  McQuade Decl., Ex. 1, at 253.

126.   Wyeth typically approves requests by employees in the Research and Development Department to attend outside conferences if there is a legitimate business reason for attending the conference, such as that the conference will benefit the employee, and, in turn, will benefit Wyeth.  McQuade Decl., Ex. 4, at 67-68.

127.    Such a legitimate business interest is necessary because employees miss work while they are at conferences (and are paid by Wyeth while attending conferences) and Wyeth pays the registration fees and reasonable travel expenses associated with the conferences. McQuade Decl., Ex. 4, at 68.

128.    When Sutherland decides whether to grant a request to attend a scientific conference, she evaluates generally whether there is a strong business case justification for the employee's attendance. Sutherland Decl., at ¶ 10. Among other things, she considers: (1) the extent to which the content of the conference is relevant to and can be immediately applied to an employee's work; (2) whether or not a "poster" or summary of his recent work will be presented at the conference; (3) the employee's job performance; and (4) the expense involved in sending the employee to the conference. Sutherland Decl., at ¶ 10.

129.    Sutherland is more likely to grant an employee's request to attend a scientific conference if he has authored an approved poster being presented at the conference or is himself presenting an approved poster because it is an opportunity to share Wyeth's recent work with the scientific community. Sutherland Decl., at ¶ 10.

130.    In August 2007, Jennings asked Sutherland whether he could attend a conference in North Carolina. McQuade Decl., Ex. 1, at 170-71; Sutherland Decl., at ¶ 12 & Ex. 6. Sutherland responded by asking how this conference was different from the conference he had attended approximately two years earlier in Florida and by asking Jennings: "What do you expect to gain from this course and how are you going to apply this to your role? (Basically I need a business case justification)." McQuade Decl., Ex. 1, at 170-71 & Ex. 5; Sutherland Decl., at ¶ 12.

131.    Jennings admits that the conference he wanted to attend in North Carolina involved "process development," as had the conference he attended in Florida in 2005. McQuade Decl., Ex. 1, at 259.

132.    Jennings also admits that he did not know how the conference he had attended in Florida in 2005 differed from the conference he wanted to attend in North Carolina. McQuade Decl., Ex. 1, at 258.

133.    Jennings failed to respond to Sutherland's questions, failed to provide any business justification for the trip, and abandoned his request. McQuade Decl., Ex. 1, at 170-71; Sutherland Decl., at ¶ 13.

134.    According to Jennings, he refused to respond to Sutherland's request because he felt that, given the number of years he had worked at Wyeth, Sutherland should have simply approved his paid time away from work and approved his trip to North Carolina at Wyeth's expense without asking for any business justification. McQuade Decl., Ex. 1, at 175-76.

135.    Jennings testified as follows at his deposition:

Q:    And did you provide her with that business justification?

A:    I didn't – no, I didn't even answer it.

....

Q:    Karen Sutherland asked you to explain – to provide a business justification for it and you provided her with no business justification; isn't that correct?

A:    After 25 years working there, should I have to explain a business [just]ification for her, for 25 years of service, sir.

Q:    So you felt that that was something you didn't have to do?

A:    Not after 25 years.

McQuade Decl., Ex. 1, at 171, 175-76.

136.    Jennings testified that he believes that Sutherland asked him for a business justification for this course because he had complained about Guinosso in June 2003. McQuade Decl., Ex. 1, at 177.

137.    Jennings conceded at his deposition that he had no basis for believing that Sutherland asked him for a business justification for his all-expense paid trip to North Carolina before approving it because he had complained about the incident with Guinosso in June 2003:

> Q:    So you think Karen Sutherland denied you the request to take this course in North Carolina because you had complained about Guinosso in June 2003. Is that your understanding?
>
> A:    Yes, sir.
>
> Q:    And do you have any basis for believing that?
>
> A:    No, sir. Just, as you could say, a good hunch.

McQuade Decl., Ex. 1, at 177.

138.    O'Brien was not involved with Jennings' request to attend a conference in North Carolina. McQuade Decl., Ex. 4, at 69.

**Wyeth Harassment Policies And Practices**

139.    Wyeth has had a written policy against unlawful discrimination during all times relevant to this action. Herpel Decl., at ¶¶ 3, 5 & Exs. 1-2.

140.    The purpose of Wyeth's discrimination policy is to ensure that all employees are permitted to work in an environment free from any type of unlawful discrimination or harassment. Herpel Decl., at ¶ 4.

141.    Under this policy, Wyeth employees are "strongly encourage[d]" to promptly report to their immediate manager, any other manager, or their Human Resources representative,

"all incidents of discrimination, discriminatory harassment or other inappropriate workplace behavior." Herpel Decl., at ¶ 6.

142.    The policy directs employees who feel that using such a procedure would be "unreasonable" or who felt unsatisfied with a manager's response, to discuss their concerns with any Regional Human Resources representative, or to contact Wyeth's Human Resources Help Line. Herpel Decl., at ¶ 6.

143.    Under Wyeth's policy, if a complaint of discrimination is reported to the Human Resources Department, Human Resources promptly investigates and advises management on appropriate actions. Herpel Decl., at ¶ 6.

144.    Employees are asked to sign a written acknowledgment, indicating that they have received a copy of Wyeth's Harassment and Discrimination Policy and that they understand that it is their responsibility to familiarize themselves with the policy. Herpel Decl., at ¶ 6.

145.    Jennings received a copy of Wyeth's Harassment and Discrimination Policy and signed the written acknowledgement indicating that he reviewed the policy. Herpel Decl., at ¶ 6 & Ex. 3.

146.    Wyeth's policy against unlawful discrimination is also included in Wyeth's Code of Conduct. Herpel Decl., at ¶ 8 & Ex. 4.

147.    Jennings signed a certificate of compliance, indicating that he had read, understood and would comply with the policies set forth in the Code of Conduct, and that he was not aware of any unreported violations of such policies. Herpel Decl., at ¶ 8 & Ex. 5.

148.    As referenced in the Code of Conduct, Wyeth makes its discrimination policies, including questions and answers explaining those policies, available to employees through the Human Resources website at http://insidewyeth.com/wyethhr. Herpel Decl., at ¶ 9.

149.     Wyeth also publishes a series of questions and answers on the Human Resources website regarding Wyeth's unlawful harassment and discrimination policy.  Herpel Decl., at ¶ 9 & Ex. 6.

150.     In addition to the mechanisms outlined in Wyeth's policy against unlawful discrimination, Wyeth employees may report a complaint of harassment or discrimination through a Compliance Hotline, established in the Fall of 2000, or through an Ethics Hotline, established in the Fall of 2004.  Herpel Decl., at ¶ 10.

151.     Wyeth also requires all employees to attend a Civil Treatment training course which includes information about its harassment and discrimination policies.  Herpel Decl., at ¶ 11.

152.     As a part of their orientation when they begin working at Wyeth, all new employees receive information discussing Wyeth's harassment and discrimination policies. Herpel Decl., at ¶ 11.

153.     Jennings received copies of Wyeth's Code of Conduct, its Equal Employment Opportunity Policy, and its Harassment and Discrimination Policy.  McQuade Decl., Ex. 1, at 214-18 & Exs. 7-8; Herpel Decl., at ¶¶ 6, 8 & Exs. 3-5.

154.    Jennings understood that he could complain to the Human Resources Department

about harassment.  McQuade Decl., Ex. 1, at 219-20.


Dated: New York, New York
      February 29, 2008

                ORRICK, HERRINGTON & SUTCLIFFE LLP

        By: _____
                Michael Delikat
                James H. McQuade
                Mayotta H. Anderson
                666 Fifth Avenue
                New York, New York 10103
                (212) 506-5000

                Attorneys for Defendants Wyeth Pharmaceuticals, Inc. and
                Charles Guinosso